# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### WESTERN DIVISION

**JOSHFER NICHOLS**                                  **PLAINTIFF**

**VERSUS**                **CIVIL ACTION NO. 5:09cv18-DCB-JMR**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY**            **DEFENDANT**

## REPORT AND RECOMMENDATION

This cause comes before this Court on Plaintiff's Motion [12-1] for Judgment on the Pleadings as well as Defendant's Motion [14-1] for an Order Affirming the Commissioner's Final Decision. Both Motions are accompanied by Memorandums [13-1; 15-1] in Support. Plaintiff has also filed a Rebuttal [16-1] to Defendant's Motion [14-1] to Affirm. Having considered the Motions [12-1; 14-1], the Memorandums in Support [13-1; 15-1], the Plaintiff's Rebuttal [16-1], the record of proceedings below, along with the record as a whole and the relevant law, this Court finds that Plaintiff's Motion [12-1] for Judgment on the Pleadings should be denied. The Court further finds that Defendant's Motion [14-1] for an Order Affirming the Commissioner's Final Decision should be granted.

## ADMINISTRATIVE PROCEEDINGS

On November 10, 2005, Plaintiff applied for Supplemental Security Income benefits ("SSI") and Child's Insurance Benefits ("CIB"). (Transcript of the Administrative Record, hereinafter "Tr.," 19, 53-58.) In his application, Plaintiff claimed he had been unable to work since October 18, 2004, due to his onset of juvenile diabetes. (Tr. 64). Plaintiff's claim was denied initially and on reconsideration. (Tr. 33-34, 35-39, 43-46.) Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 47.) On June 12, 2007, Plaintiff appeared with counsel and

testified at a hearing before the ALJ. (Tr. 238-256.)  A Vocational Expert ("VE") also offered testimony at the hearing. *Id.*  The ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 16-26.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision, thus making the determination the "final decision" of the Commissioner. (Tr. 6-9.)  On February 20, 2009, Plaintiff filed the instant action for judicial review pursuant to 42 U.S.C. § 405(g) of the Social Security Act. (*See* Compl. [1-1].)

## FACTS

Plaintiff was twenty-two (22) years old when the ALJ denied his application for CIB and SSI benefits. (Tr. 26, 53.)  He has a high school education (Tr. 67, 242) and worked briefly as a fast-food worker and as a cleaner. (Tr. 72, 243-44, 253.)  Plaintiff worked approximately one (1) week at McDonald's fast-food restaurant in 2005 and about two (2) to three (3) months at Sanderson Farms as a cleaner in 2006. *Id.*  Plaintiff alleges that he became disabled on October 18, 2004, as a result of diabetes. (Tr. 64.)

On October 26, 2004, Dr. McCune at the Jefferson Comprehensive Health Center informed Plaintiff that he had been diagnosed with juvenile diabetes. (Tr. 158.)  Plaintiff was counseled regarding nutrition and prescribed medication. *Id.*  Two days later, Dr. McCune noted that Plaintiff's glucose level had ranged from 380 to 416 and he adjusted Plaintiff's medication. (Tr. 157.)  On November 4, 2004, Dr. McCune reviewed Plaintiff's blood glucose reports and decided that no adjustments were necessary. (Tr. 156.)  Plaintiff's glucose levels ranged from 56 to 550. *Id.*  Dr. McCune assessed Plaintiff on November 24, 2004, prescribed medication and instructed Plaintiff to monitor his blood glucose levels prior to his evening meal. (Tr. 155.)  The Court notes that the record reveals that Plaintiff's blood sugar levels were frequently normal - or, at least, lower - during morning hours but elevated at night. (Tr. 200-16.)  Dr. McCune noted that Plaintiff's vital signs were

within normal limits and that the disease had not significantly affected any organ. *Id.*

On November 4, 2003, about one year prior to Plaintiff's alleged onset date, Plaintiff visited Dr. Willie McArthur for treatment related to cephalgia, dizziness, and sinusitis.[1] (Tr. 110.) On April 4, 2005, Dr. McArthur recorded Plaintiff's blood sugar at 451. (Tr. 109.) Plaintiff was prescribed medications and instructed to attend counseling. *Id.* On April 24, 2005, Dr. McArthur assessed that Plaintiff's diabetes was "out of control," that Plaintiff could not afford his medications and that he "need[ed] help." (Tr. 108.) Plaintiff's blood sugar level was 206. *Id.*

On June 7, 2005, Dr. McArthur submitted a form stating that Plaintiff had been diagnosed with juvenile onset diabetes mellitus, cephalgia, dizziness, and sinusitis. (Tr. 107.) He described Plaintiff's prognosis as "fair." *Id.* Plaintiff's last visit to Dr. McArthur had taken place on April 25, 2005. *Id.*

Plaintiff visited Dr. McArthur's office on June 9, 2005 complaining of an upset stomach and diarrhea. (Tr. 224.) Plaintiff's blood sugar level was at 44. *Id.* On August 8, 2005, Plaintiff complained of an abscessed tooth; his blood sugar was 311. (Tr. 225.) On November 7, 2005, Plaintiff returned for a check up and complained of "spots on upper left arm [and] shoulder area." (Tr. 226.) Plaintiff's blood sugar level was 97. *Id.* Plaintiff returned for a check up on December 5, 2005; his blood sugar level was 320. (Tr. 227.)

Dr. McArthur completed a questionnaire regarding Plaintiff's condition on December 5, 2005. (Tr. 196-199.) He opined that Plaintiff's diabetes-related symptoms included fatigue, malaise, muscle weakness, episodic vision blurriness, difficulty thinking, excessive thirst, frequency of urination, hypoglycemic attacks, and infections. (Tr. 196-197.) The only objective sign of Plaintiff's

---

[1]The Court notes that a great deal of the evidence contained in the record represents Plaintiff's medical condition prior to October 18, 2004, the alleged onset date of Plaintiff's diabetes and does not relate to the conditions that purportedly render Plaintiff disabled. (*See* Tr. 110-149.)

impairment that Dr. McArthur identified was a blood sugar level of 320. (Tr. 196.) Dr. McArthur noted that Plaintiff's blood sugar was not controlled. *Id*. at 197.

Also, Dr. McArthur opined that Plaintiff could not concentrate, handle even low stress, and would be a hazard to himself and others. (Tr. 197.) He asserted that Plaintiff would require unscheduled breaks during an eight (8) hour work day and that Plaintiff would have trouble with repetitive reaching, handling, or fingering due to "muscle weakness." *Id.* Dr. McArthur claimed that Plaintiff's medications caused drowsiness and confusion. *Id.* He estimated that Plaintiff could only walk five (5) blocks without rest. *Id.* Dr. McArthur further estimated that Plaintiff could sit for either forty-five (45) minutes or two (2) hours and stand for either thirty (30) minutes or two (2) hours. (Tr. 198.) Also, Dr. McArthur opined that during an eight (8) hour work day Plaintiff could stoop 75% of the time and crouch 25% of the time. *Id.* He also asserted that Plaintiff would likely have "good days" and "bad days," but would probably miss about four (4) days of work per month. *Id.*

On January 20, 2005, a provider at the Jefferson Comprehensive Health Center recorded that Plaintiff was not suffering any "complications" and that he had "no episodes of hypoglycemia." (Tr. 154.) Plaintiff was to continue his regimen. *Id.* On February 3, 2005, Plaintiff's blood sugar level was rated at 362. *Id.* Plaintiff reported back to the Health Center on February 8, 2006 complaining that his blood sugar was elevated and that he had not had a bowel movement in three days. *Id.* Plaintiff's medication had run out three (3) weeks previously and his diabetes was described as uncontrolled. (Tr. 153-154.)

Plaintiff returned to the Health Center for a follow up visit on February 13, 2006, and iterated that his blood sugar level was 233. (Tr. 152.) Plaintiff was referred to a diabetic support group. *Id.* On March 14, 2006, Plaintiff's blood sugar level was 133, with medication, and his condition was

noted as "better." (Tr. 151.) Plaintiff was again told to attend a diabetic support group. *Id.*

Plaintiff visited the Jefferson County Hospital emergency room on October 10, 2004, complaining of a shoulder injury that he incurred while playing football. (Tr. 168.) He was discharged that day in stable condition. *Id.*

On February 20, 2005, Dr. Richard Mazur at the Jefferson County Hospital noted that Plaintiff had been admitted to the hospital with a blood sugar level at 600. (Tr. 170.) Plaintiff had stopped taking his medications because of financial reasons. *Id.* While at the hospital, Plaintiff's diabetes "was put under good control with IV insulin, diet control and careful monitoring." *Id.* Plaintiff was also counseled regarding the use of an insulin pump. *Id.* Plaintiff was discharged in good condition and instructed to discuss his condition with his family, physician and social services. *Id.* Dr. Mazur also noted that Plaintiff liked to play football. (Tr. 171.)

Plaintiff returned to the emergency room at the Jefferson County Hospital on February 5, 2006, describing "weakness" in his "lower legs." (Tr. 177.) Plaintiff suffered from uncontrolled diabetes. *Id.* Plaintiff was not taking his medication due to procurement problems. *Id.* His blood sugar level was measured at 368 and 401. (Tr. 178-79.) Plaintiff returned to the emergency room two (2) days later and was diagnosed with a "viral syndrome" and "dehydration." (Tr. 180-81.) Plaintiff's blood sugar level was at 267. (Tr. 181.) It was noted that Plaintiff had been without his medication for at least a week. (Tr. 180.)

On February 8, 2006, Plaintiff was admitted to the hospital and stayed through February 11, 2006. (Tr. 182-85.) Dr. JoAnn Francis noted that four (4) days prior, Plaintiff had been instructed to "follow up at a local clinic for discounted medications" but Plaintiff "failed to follow up on the suggestion given to him." (Tr. 182.) Dr. Francis further noted that Plaintiff arrived at the hospital three (3) days after receiving this advice with a blood sugar level "greater than 400." *Id.* Plaintiff

was weak and "unable to really walk without assistance." *Id.* During his stay at the hospital, Plaintiff's blood sugar levels initially were controlled with medications, but Plaintiff opted to eat "food from the vending machines on frequent occasions during his admissions." *Id.* After Plaintiff was observed eating food from the vending machines, a "random blood glucose test" revealed elevated glucose levels. *Id.* Plaintiff was "advised strongly to come to [a clinic] for free insulin therapy and severely discounted medications," and he was urged to "remain on the diabetic diet and never run out of medications in the future." (Tr. 183.) Plaintiff was discharged in stable condition. *Id.*

On May 11, 2006, Plaintiff obtained a refill of his medications from Dr. Francis at the Jefferson Comprehensive Health Center and she advised Plaintiff to join a diabetic support group. (Tr. 237.) Plaintiff returned for an additional refill on July 10, 2006, and at that time he seemed alert and oriented and no problems were noted. (Tr. 236.) On October 10, 2006, Plaintiff again visited for more medications. *Id.* Dr. Francis advised Plaintiff to seek a nutrition evaluation, join a diabetic support group, and have a yearly eye evaluation. *Id.* On December 5, 2006, Plaintiff returned to pick up his medications and Dr. Francis wrote that Plaintiff was "almost well" on his current medications, and she referred him for a three month supply of insulin. (Tr. 235.) Similarly on January 26, 2007, February 21, 2007, and April 11, 2007, Plaintiff returned for medication refills. (Tr. 233-34.)

On June 6, 2007, Dr. Francis filled out a questionnaire - very similar to the questionnaire that Dr. McArthur had previously filled out - concerning Plaintiff's condition. (Tr. 229-32.) She stated that she had treated Plaintiff since February 8, 2006 for diabetes and other concerns. (Tr. 229.) She noted that Plaintiff had not developed diabetic neuropathy. (Tr. 230.) Dr. Francis identified blood work readings as relevant clinical findings. (Tr. 229.) She opined that Plaintiff's condition would frequently interfere with attention and concentration, and that Plaintiff was incapable of handling

stress due to his "short attention span." (Tr. 230.)  Dr. Francis also claimed that Plaintiff would need

unscheduled breaks and would have trouble with repetitive reaching, handling, and fingering due to

muscle weakness. *Id.*  She noted that Plaintiff's medication caused stomach aches, but no other side

effects which would affect working. (Tr. 231.)  She estimated that Plaintiff could only walk three

(3) to four (4) blocks, sit between thirty (30) minutes and an hour, and stand between twenty (20)

minutes and an hour. *Id.*  Dr. Francis claimed that Plaintiff would have good days and bad days, but

that he would miss more than four (4) days of work per month. *Id.*  She estimated Plaintiff's

prognosis as being "fair." *Id.*

On March 8, 2005, Dr. Cherilyn Hebert, a medical consultant, opined that Plaintiff's diabetes

was "NOT well controlled" but that the condition "[s]hould be non-severe with optimal compliance

by the claimant." (Tr. 176.)  On March 9, 2006, Dr. Barry Tillman performed a physical examination

of Plaintiff as part of the disability development process. (Tr. 186-87.)  Plaintiff noted that he

became sick "when he [ran] out of medicines." (Tr. 186.)  Plaintiff also reported weakness in his

legs, blurred vision, fatigue, headaches, nausea and vomiting. *Id.*  Dr. Tillman's exam yielded no

abnormalities in Plaintiff, and he opined that Plaintiff had diabetes but he detected "no impairments."

(Tr. 187.)  On May 8, 2006, Madena Gibson, a state-agency consulting physician, opined that

Plaintiff did not suffer any severe impairments. (Tr. 188.)

Plaintiff testified at the administrative hearing in front of the ALJ on June 12, 2007, that he

then received medical care from Dr. Francis, following the retirement of his family doctor. (Tr. 245.)

Plaintiff stated that he is still taking insulin and a glucose supplement. (Tr. 247, 250.)  He claimed

these medications caused sleepiness and drowsiness. (Tr. 248.)  Plaintiff revealed that he had been

recently hospitalized when he ran out of medicine. (Tr. 245.)  Plaintiff admitted that he never

participated in a diabetic nutrition program, but claims he followed a diet. (Tr. 248.)  Plaintiff

testified that he tried to follow his doctors' orders, but admitted that he did not follow up with instructions that he acquire an insulin pump. (Tr. 251-53.)

Plaintiff asserted that he was capable of caring for his personal needs, but did not do chores. (Tr. 245.) Plaintiff estimated that he could pick up a chair. (Tr. 246.) Meanwhile, he could extend his arms and had no problems with overhead reaching. *Id.* Plaintiff surmised that he could sit for twenty (20) to thirty (30) minutes and stand for approximately twenty (20) minutes. (Tr. 247.) He averred that he could only walk for two (2) to three (3) blocks. *Id.* Plaintiff claimed that he became overheated easily, and experienced fatigue and weakness, causing him to lie down four (4) or five (5) times every day. (Tr. 249.) He claimed to have vision problems, but had not sought testing. *Id.* Plaintiff stated that he had no hobbies and did not attend a church, civic group, or club. (Tr. 245.) Plaintiff had graduated high school and fathered a child. (Tr. 242.)

The ALJ posed a hypothetical question to the VE, who was also present at the hearing. (Tr. 254-55.) The ALJ posited an individual with the same age, education, and past work experience as Plaintiff that retained the RFC to perform light work. *Id.* However, the ALJ cautioned that the individual would be limited to "only occasional climbing and balancing;" could never use a ladder; and would "need to avoid temperature extremes, humidity, fumes and hazards." *Id.* The VE responded that such an individual could perform work as a cashier, packager, or sorter. *Id.* In response to an additional hypothetical, the VE testified that an individual would be unable to work if the person would require additional, unscheduled breaks; might miss work more than three days per month; and would be off task more than 40% of the time. (Tr. 255.) Plaintiff's counsel asked one question regarding the geographical area relevant to the data offered by the VE pertaining to the jobs in question. (Tr. 255-56.) At that point, Plaintiff's counsel stated that she had "no questions." (Tr. 256.)

## STANDARD OF REVIEW

On review, the ALJ's determination that a claimant is not disabled will be upheld if the findings of fact upon which it is based are supported by substantial evidence on the record as a whole, and it was reached through the application of proper legal standards. 42 U.S.C. § 405(g); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). The United States Supreme Court defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," being "more than a scintilla, but less than a preponderance." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

All evidentiary conflicts are resolved by the Commissioner, and if substantial evidence is found to support the decision, then the decision is conclusive and must be affirmed, even if there is evidence on the other side. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). On appeal, the court may not re-weigh the evidence, try the case *de novo*, nor substitute its own judgment for that of the Commissioner, *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988), even if it finds the evidence preponderates against the decision. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994).

## ANALYSIS

At the first step of the sequential evaluation, the ALJ found that Plaintiff had not engaged in any substantial gainful employment since his alleged onset date. (Tr. 21). The ALJ determined that Plaintiff had a severe impairment, juvenile onset diabetes mellitus, with insulin dependence. (Tr. 22.) However, the ALJ found that this impairment did not meet or equal any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Before turning to the fourth step, the ALJ determined Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. § 404.1545 defines RFC as the type of work an individual can perform despite the limiting effects of his impairments. The ALJ found that Plaintiff had:

> the residual functional capacity to lift and carry 20 pounds occasionally, 10 pounds frequently, sit for 6 hours, stand and walk for 6 hours with occasional climbing and balancing, never on ladders, and he must avoid temperature extremes, humidity, fumes and hazards.

*Id.* Pursuant to 20 C.F.R. § 404.1567(b), light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Thus, the ALJ found that Plaintiff retained the ability to perform light work with certain restrictions. The ALJ gave Plaintiff the full benefit of doubt as to his subjective complaints by reducing the exertional level to light with the enumerated restrictions. (Tr. 24.)

At step four of the sequential process, the ALJ ascertained that Plaintiff had no past relevant work. (*See* Tr. 24.) At step five, however, the ALJ, in considering the testimony of the Vocational Expert ("VE"), Plaintiff's age, education, work experience and RFC, found that Plaintiff could perform jobs that exist in significant numbers in the national economy. (Tr. 24-26.)

The Plaintiff argues two points of error by the ALJ. First, Plaintiff asserts that the ALJ erred in assessing Plaintiff's RFC by not adequately weighing the opinions of Plaintiff's treating physicians. (Pl.'s Mem. [13-1] 9.) Second, Plaintiff argues that the ALJ erroneously found the VE's testimony consistent with the Dictionary of Occupational Titles ("DOT"). *Id*. at 13-16.

## A.  Physician Opinions of Record

As to Plaintiff's first claim, he argues that the ALJ erred in giving little or no weight to the medical opinions of his treating physicians, Dr. McArthur and Dr. Francis. (Pl.'s Mem. [13-1] 11.) The Court notes that an ALJ is required to review the medical evidence and consider the various medical opinions contained in the record. Medical opinions are statements from an acceptable medical source about the nature and severity of an individual's impairments. Defendant argues that a statement that an individual is disabled or cannot work is not a medical opinion, and an ALJ is not

bound to accept such a statement, regardless of the source.  In fact, such matters are reserved for the Commissioner to decide.  *See* 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1).

The Commissioner's regulations and rulings provide that the opinion of a treating physician is to be given controlling weight when it is an actual opinion from a treating source that is well supported by clinical findings and is consistent with the record as a whole.  *See* 20 C.F.R. §§ 404.1527, *Social Security Ruling* (SSR) 96-2p.  The Fifth Circuit has held that the opinions of a treating physician should be afforded substantial weight, unless there exists good cause not to do so. Recognized good cause exceptions include opinions not supported by laboratory or clinical findings, brief conclusory statements, or opinions not otherwise supported by the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).  However, even if given full weight, a physician's opinion is not controlling on the issue whether an individual is able to work. *Martinez v. Chater*, 64 F.3d 172, 176-176 (5th  Cir. 1995).

Plaintiff complains that the ALJ did not adopt the opinion of Plaintiff's principal treating physician, Dr. Francis. (Pl.'s Mem. [13-1] 10.)  Plaintiff avers that even if the ALJ decided not to grant Dr. Francis' opinion controlling weight, the ALJ should have treated her opinion as a "medical source statement" under 20 C.F.R. §§ 416.927(d) and allocated it the greatest weight and adopted the opinion. *Id.* at 11.

Ordinarily, a treating physician's opinion on the issues of the nature and severity of impairment is entitled to controlling weight, provided that the opinion is well supported by medical evidence and not inconsistent with other substantial evidence. 20 C.F.R. §§ 416.927(d)(2). Accordingly an ALJ must take the following factors into consideration when determining the weight to be given to the opinions of a treating physician: (1) length of treatment, (2) frequency of examination, (3) nature and extent of relationship, (4) support provided by other evidence, (5)

consistency of opinion with record, and (6) specialization. *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *see also* 20 C.F.R. § 416.927(d)(2)(i)-(ii), (3)-(6).

However, "[w]hen good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony. The good cause exceptions... include disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." *Greenspan*, 38 F.3d at 237; *see also* 20 C.F.R. § 416.927(d)(2). The ALJ is entitled to determine the credibility of all witnesses, including medical experts, and weigh their opinion accordingly. *Greenspan*, 38 F.3d at 237; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). The opinion of a treating physician "may be assigned little or no weight when good cause is shown. Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir. 2000) (citation omitted); *see also Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (in determining whether to give a treating physician's opinion controlling weight, the ALJ must look to whether the opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with... other substantial evidence'" (quoting 20 C.F.R. § 404.1527(d)(2))). "[A]lthough the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quotation omitted).

The ALJ found that Plaintiff's diabetes was a severe impairment, however, the ALJ further found that the medical evidence of record did not support Plaintiff's alleged level of incapacity. The

ALJ rejected Dr. Francis' opinion by noting that (1) all the physical exams were normal; (2) "no functional limitations at all [were noted] in either objective findings or imaging results;" and (3) Plaintiff's impairment was uncontrolled because Plaintiff did not comply with treatment. (Tr. 24.) The ALJ also noted that "[Dr. Francis'] notes [were] devoid of any objective findings to support any of her opinion." *Id.* Plaintiff asserts that the ALJ should have regarded the laboratory diagnostic techniques used in the Jefferson County Hospital as objective findings. (*See* Pl.'s Mem. [13-1] 10.) However, Plaintiff has failed to cite any laboratory diagnostic techniques used that would objectively support functional limitations. The Court further notes that the record reflects that Plaintiff's treating physicians never restricted his walking, standing, sitting, lifting, or working activities.

The ALJ found that Plaintiff was impaired by his juvenile diabetes and mentioned Plaintiff's diabetes-related maladies, however, these conditions do not translate to the functional limitations depicted by Dr. Francis or Dr. McArthur. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983). The mere presence of some impairment is not disabling per se. Plaintiff must show that he was so functionally impaired by his diabetes that he was precluded from engaging in any substantial gainful activity. *Id.* (citing *Demandre v. Califano*, 591 F.2d 1088 (5th Cir. 1979)). In the absence of objective medical evidence indicating that Plaintiff suffered disabling diabetes, Plaintiff fails to meet his burden of proving disability. *Id.* Plaintiff has not pointed to any objective findings in Dr. Francis' notes, or in the record as a whole, that support the functional limitations limned by Dr. Francis. In fact, Plaintiff's medical record reveals that his weakness resulted from high blood sugar levels following periods of not taking his medications. (Tr. 153-54, 170-73, 182-85.) Even Dr. Francis noted that Plaintiff's fatigue and general weakness was attributed to his poor control of his diabetes. (Tr. 230.)

Dr. Francis suggests that Plaintiff can only walk for three (3) to four (4) blocks, sit between thirty (30) minutes and an hour, and stand between twenty (20) minutes and an hour. (Tr. 231.)

However, as the ALJ surmised, the record reveals that the limitations set forth by Dr. Francis were derived from Plaintiff's own self-report. (Tr. 24.) The objective testing at the Hospital only reveal that Plaintiff had uncontrolled diabetes when he was admitted for care after not taking medications. (Tr. 170-73, 183-85.) Plaintiff's medical records are replete with doctors counseling Plaintiff about the importance of taking his medications and not running out, as well as advice on where to get greatly discounted medications and an insulin pump. The ALJ found, and the Commissioner maintains, that Plaintiff's condition is controlled with medication. (Tr. 24.) Furthermore, the ALJ correctly noted that Plaintiff has not been hospitalized or visited the emergency room since February 2006, and the record suggests that he is obtaining his medications and not experiencing these episodes. (Tr. 24.) Defendant posits, and this Court agrees, that there is no evidence in the record that the functional limitations set forth by Dr. Francis, or Dr. McArthur, accurately describe Plaintiff's condition when properly medicated.

Plaintiff claims that the ALJ considered only the opinions and Medical Source Statements of Dr. McArthur and Dr. Francis and therefore the ALJ's decision contained no other substantial evidence which was inconsistent with Plaintiff's treating physician's opinions. (*See* Pl.'s Rebuttal [16-1] 5.) However, Plaintiff's allegation is simply incorrect. While the ALJ did not specifically cite by name any other doctors in her decision, the ALJ directly mentioned and referenced the medical records and reports of Dr. Mcune, Dr. Mazur and Dr. Tillman, and she identified such by their respective exhibit numbers. (Tr. 23-24.) Furthermore, the ALJ repeatedly stated that she considered all the evidence contained in the record. (Tr. 19, 21, 24.)

Dr. Mazur treated Plaintiff only once, during a hospital visit on February 20, 2005, and thus he is not a treating physician. (Tr. 170-72); *see also* 20 C.F.R. §§ 404.1502, 416.902; 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i). Defendant asserts, however, that Dr. Mazur's treatment notes do

not conflict with the ALJ's findings. Further, Defendant correctly points out that the ALJ explicitly addressed Plaintiff's February 20, 2005 hospital visit in her decision. (Tr. 23-24.)

Dr. Mazur's notes reveal that Plaintiff was admitted to the hospital "for juvenile diabet[es], marked hyperglycemia, [and] ketoacidosis." (Tr. 170.) Upon admittance Plaintiff's blood sugar level was at 600; Plaintiff had stopped taking medications because of financial reasons. *Id.* The ALJ acknowledged Plaintiff's visit to the hospital on February 20, 2005, and even found that Plaintiff's diabetes constituted a severe impairment. (Tr. 22-24.) At that point, the ALJ had to determine what functional limitations Plaintiff's impairment imposed upon his ability to work. *See* 20 C.F.R. §§ 404.1545(a)(1), 404.1569a, 416.945(a)(1), 416.969a. Upon physical examination, Dr. Mazur found Plaintiff to be alert, oriented, and in no acute distress. (Tr. 170.) He detected no eye problems, and noted that Plaintiff was able to move all of his extremities. (Tr. 170-71.) A nurse's assessment indicated that Plaintiff's mental status was normal; that his gait was balanced; and that he was capable of moving all extremities. (Tr. 173.) Plaintiff informed Dr. Mazur that he liked to play football, which Defendant notes is in contrast to his supposed physical incapacity. (Tr. 168, 171.) Plaintiff was discharged in "good condition" and instructed to obtain medications via social services. (Tr. 170.) Dr. Mazur's report does not set forth a single functional limitation.

Further, the ALJ relied on Dr. Tillman's opinions. (Tr. 23-24.) Dr. Tillman's report demonstrates that, when Plaintiff took his medicine, he does not have any serious physical limitations. (Tr. 186-87.) Plaintiff even acknowledged at the examination that he only became sick when he did not take his medications. (Tr. 186.) Upon physical examination, Dr. Tillman noted that Plaintiff appeared well-developed and well-nourished, his mental state was clear, he arises to and from examining table without assistance, he dresses and undresses himself, he has normal station and gait, and he has normal range of motion of upper and lower extremities. *Id.* Dr. Tillman found "no

abnormalities in this patient" and "saw no impairments." (Tr. 187.)

Substantial evidence contained in the record represents that the exacerbations in Plaintiff's condition stemmed from noncompliance with medication and his dietary regimen. *See* 20 C.F.R. §§ 404.1530, 416.930 (establishing that failure to follow treatment advice precludes finding of disability). Both Plaintiff's February 2005 and February 2006 hospitalizations were directly attributable to Plaintiff's failure to adhere to his medication regimen. (Tr. 170, 177.) Also, multiple physicians have advised Plaintiff to join a diabetic support group, but Plaintiff has never done so. (Tr. 151-52, 236-37, 248.) Plaintiff was instructed to procure an insulin pump - and even told where he could go to get one - however, even at the time of the hearing, Plaintiff had not followed up on obtaining a pump. (Tr. 170, 252.) Plaintiff did not properly obtain his medications as directed and on occasion did not show up for scheduled appointments. (Tr. 182.) Most notably, the record exhibits Plaintiff's betrayal of medical advice regarding his diet in February 2006, while hospitalized for diabetes-related symptoms, long after his initial diagnosis and admonitions regarding his diet. (Tr. 158, 170, 182.) During his February 2006 hospitalization, Plaintiff was observed by hospital staff eating "food from the vending machines on frequent occasions during his admissions." (Tr. 182.) Dr. Francis observed Plaintiff's blood glucose readings to be sharply elevated following Plaintiff's indulgence. (Tr. 182.) Defendant is correct in noting that Plaintiff's dietary medical regiment when removed from medical supervision is unknown, but his conduct at the hospital gives rise to a reasonable inference that Plaintiff's typical compliance level was likewise deficient. The ALJ specifically found that Plaintiff had not been hospitalized since February 2006, when he began receiving free medication. (Tr. 24.)

Plaintiff asserts that "no medical evidence" supports the ALJ's decision. (*See* Pl.'s Mem. [13-1] 10, 12.) This Court disagrees. Defendant concedes that the ALJ did not explicitly rely upon the

opinions of Dr. Hebert and Dr. Gibson, the state-agency consulting physicians. (*See* Def.'s Mem. [15-1] 19.) However, both physicians thought that Plaintiff's diabetes did not even constitute a severe impairment, at least if properly medicated. (Tr. 176, 188.) As stated earlier, the ALJ found Plaintiff to be severely impaired. The ALJ, however, did rely upon the opinions and records of Dr. Tillman and Dr. Mazur. (Tr. 23-24.)

Plaintiff concedes that the ALJ was not obligated to accord controlling weight to the opinions of Dr. Francis and Dr. McArthur, but maintains that she was obligated to detail more exhaustively her reasons for rejecting their opinions pursuant to *Newton v. Apfel*, 209 F.3d 448 (2000) (construing 20 C.F.R. §§ 404.1527(d) and 416.927(d)). In *Newton*, the Fifth Circuit reversed an ALJ's decision rejecting the opinion of a treating physician without performing an analysis based on the six factors listed in 20 C.F.R. § 404.1527(d)(2). However, *Newton* is distinguishable. In *Newton*, the ALJ "summarily rejected the opinions of Newton's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." *Id.* at 458. *Newton* did not involve "competing first-hand medical evidence," nor did it involve "the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* In the case *sub judice*, competing first-hand medical evidence was present that contradicted Dr. McArthur's and Dr. Francis' assessments. That evidence, discussed in detail above, included Dr. Tillman's and Dr. Mazur's examinations, medical records indicating Plaintiff's weakness and hyperglycemia resulted from Plaintiff not taking his medications or following a dietary regiment, and Plaintiff's own testimony. Therefore, this Court can find no error in not crediting Dr. McArthur's and Dr. Francis' opinions. *cf. Spellman v. Shalala*, 1 F.3d 357, 364-65 (5th Cir. 1993) (holding that it was proper to reject a treating physician's opinion that the claimant could not perform sedentary work, because the opinion was inconsistent with evidence of the claimant's everyday activities and with

medical records).

As the findings expounded *supra* diverge significantly from those of Dr. Francis' and Dr. McArthur's opinions, their opinions are not consistent with the medical evidence as a whole and good cause existed to not afford Dr. Francis' or Dr. McArthur's opinions controlling weight. Thus, the ALJ's obligation to perform a detailed analysis of Dr. Francis' and Dr. McArthur's views, under the criteria set forth in 20 C.F.R. 404.1527(d), was not triggered because reliable medical evidence from treating or examining physicians, which controvert the evidence of Dr. Francis and Dr. McArthur, is reflected in the record.

## II. Vocational Expert Testimony

Lastly, Plaintiff contends that the ALJ erred in finding the VE's testimony consistent with the Dictionary of Occupational Titles since the VE did not provide DOT numbers for the jobs she mentioned in her testimony. Plaintiff claims that pursuant to SSR 00-4p the ALJ has to determine whether the VE testimony is consistent with the DOT. Plaintiff alleges that there are numerous cashier, packaging and sorting jobs in the DOT with different exertional and skill levels, and thus, without the VE assigning specific DOT numbers to the jobs she proffered the ALJ could not have determined if the VE's testimony was consistent with the DOT. Defendant responds by asserting that no inconsistency is apparent and that Plaintiff waived the right to challenge any discrepancy by failing to solicit testimony on the matter at the hearing. (Def.'s Mem. [15-1] 21.)

The Fifth Circuit has held that where there is a conflict between the VE's testimony and the DOT, the ALJ may rely upon the VE's testimony, provided that the record reflects an adequate basis for doing so. *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000). Social Security Ruling 00-4p provides that adjudicators should identify and obtain an explanation for any conflicts between the VE's evidence and the DOT, and explain in their decision how any identified conflicts were resolved.

2000 WL 1898704 (S.S.A.), at *2.

At the administrative hearing conducted on June 12, 2007, the VE testified that she reviewed the record and the exhibits having bearing on Plaintiff's work experience. (Tr. 253.) The VE also heard the testimony of Plaintiff and further stated that she did not need any additional information to form her opinion. *Id.* Upon receiving hypotheticals from the ALJ, the VE posited that an individual of the same age, education and past work experience as Plaintiff with the limitations of only occasional climbing and balancing (though never on ladders) and avoidance of extreme temperatures, humidity, fumes and hazards could perform jobs found throughout the state and regionally. (Tr. 254.) Those jobs being approximately 43,000 cashier positions throughout the state, and approximately 7,900 regionally; approximately 7,000 packaging positions throughout the state, and approximately 140 regionally; and approximately 600 sorting jobs throughout the state, and 200 regionally. *Id.* Also, when questioned by the ALJ, the VE stated that her summary was consistent with the DOT. *Id.* Plaintiff only inquired how the VE defined state and regional. (Tr. 255.) Plaintiff did not ask the VE any questions pertaining to any alleged inconsistencies with the DOT. (Tr. 253-56.)

What is involved here is merely an alleged conflict between the VE's testimony that an individual similar to Plaintiff could perform certain jobs as a cashier, packager and sorter, and certain specific DOT job descriptions for a cashier, packager and sorter that note an RFC greater than light work. Plaintiff has cited to the Court specific jobs from the DOT that state the physical demand requirements as being in excess of light work. DOT 211.382-010 (showing strength as medium for vault teller); DOT 211.467-034 (showing strength as medium for a casino change person); DOT 929.684-010 (showing strength as medium for packer); DOT 929.685-010 (showing strength as heavy for crate opener); DOT 569.687-022 (show strength as medium for sorter I); and DOT 769.687-042 (showing strength as medium for sorter II). However, SSR 00-4p clarifies that the DOT lists the

maximum requirements for a position as it is generally performed, not the full range of requirements. *See Fenton v. Apfel*, 149 F.3d 907, 911 (8th Cir. 1998) ("The DOT, in its job definition, represents approximate maximum requirements for each position rather than the range.") Clearly, "the categorical requirements listed in the DOT do not and cannot satisfactorily answer every [] situation." *Carey*, 230 F.3d at 146. Moreover, as the Defendant points out, the DOT does provide for cashier, packager and sorter jobs listing maximum physical demand requirements of the exertional level of work specified by the ALJ. *See*, *e.g.*, DOT 211.462-010 (cashier II); DOT 211.462-014 (cashier-checker); DOT 559.687-074 (inspector and hand-packager); DOT 209.687-022 (sorter); DOT 222.687-014 (garment sorter); DOT 521.687-086 (nut sorter). Therefore, the VE's potential identification of a lesser number of such positions being available at the sedentary and light level is not necessarily a conflict with the DOT.

Plaintiff maintains that the VE's testimony should have included specific DOT numbers to alleviate any potential inconsistencies. However, Plaintiff does not cite any support for his claim that the DOT numbers for positions identified by the VE must be given. Moreover, Plaintiff was given an opportunity to object or cross-examine the VE concerning the identified jobs. Nonetheless, Plaintiff's counsel did not raise the issue or challenge the VE's testimony. *See Carey*, 230 F.3d at 146 (admonishing that claimants may not "scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development at the administrative hearing."); *see also Masterson v. Barnhart*, 309 F.3d 267, 273-74 (5th Cir. 2002).

## CONCLUSION

The court has fully reviewed the entire record on this matter and finds that the Commissioner

did not err as a matter of law in reaching the "final decision" in this matter and that the decision is supported by substantial evidence. Accordingly, the Court recommends that the decision of the Commissioner is supported by substantial evidence and should be affirmed. Thus, the Court recommends that Plaintiff's Motion [12-1] for Judgment on the Pleadings be denied and Defendant's Motion [14-1] to Affirm the Decision of the Commissioner be granted.

In accordance with the Rules of this Court, any party within fourteen days after being served a copy of this recommendation, may serve and file written objection to the recommendations, with a copy to the Judge, the U.S. Magistrate Judge and the opposing party. The District Judge at that time may accept, reject or modify in whole or in part, the recommendation of the Magistrate Judge, or may receive further evidence or recommit the matter to this Court with instructions. Failure to timely file written objections to proposed findings, conclusions, and recommendations contained in this report will bar an aggrieved party, except on the grounds of plain error, from attacking on appeal- unobjected to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Services Automobile Association*, 79 F.3d 1425 (5th Cir. 1996).

THIS the ⎽⎽20th⎽⎽ day of April, 2010.

⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽*s/ John M. Roper, Sr.*⎽⎽⎽⎽⎽⎽⎽⎽
CHIEF UNITED STATES MAGISTRATE JUDGE